SARAH H. LANCASHIRE, Appellant, v. THE GARFORD MANUFACTURING COMPANY, Respondent.

Kansas City Court of Appeals, April 29, 1918.

**LANDLORD AND TENANT:** Constructive Eviction: Nuisance. Where a tenant rents a part of a building and the landlord thereafter rents another part of said building to another tenant for a lawful purpose from month to month not knowing the character of the tenant, and afterwards a nuisance, such as a house of prostitution, is maintained by the landlord's sufferance, connivance or consent,

by reason of the fact that the landlord learns of the house of prostitution and fails, upon complaint of the first tenant to put out the objectional tenant, the landlord is guilty of a constructive eviction of the first tenant who is forced to move on account of the said nuisance.

Appeal from Jackson Circuit Court.—*Hon. Thomas B. Buckner*, Judge.

AFFIRMED.

*Lathrop, Morrow, Fox & Moore* for appellant.

*Kennish & Smith* and *O. M. Edmondson* for respondent.

BLAND, J. —This is a suit for rent. The judgment and verdict was against plaintiff and she has appealed.

The evidence shows that plaintiff was the owner of premises located at 1708-10 Walnut Street, Kansas City, Missouri. These premises consisted of a two-story brick building. On the lower floor were two storerooms and the entire upper floor was made up of rooms rented out for boarding house or hotel purposes. On August 13, 1914, plaintiff by written lease demised to defendant one of the storerooms for a period of two years from April 1, 1914. The rooms on the second floor were vacant when defendant moved into the premises, about April 1, 1914, and remained vacant until December of that year when they were rented by plaintiff's agent to a Mrs. Anna Murphy, a woman of bad reputation for chastity. About March 1, 1915, Mrs. Murphy telephoned plaintiff's agent that she had sold out to a Mrs. Clara Davis, another woman who was a notorious prostitute.

Without going into the evidence in detail it is sufficient to state that it shows without any doubt that the place was conducted by the Murphy and Davis women as a house of prostitution and under the

management of the latter it became a notorious bawdy-house where thieves resorted. The evidence shows that the boisterous conduct of the inmates of the up-stairs rooms was such as to be heard by the em-ployees of the defendant; that there was an electric piano almost continually in operation; that women would shout down the rear stairway soliciting men from the alley; that automobiles and taxicabs stopped in front of defendant's place of business at all times of the day and night and men and women in a drunken condition were taken therefrom to the upstairs, and that almost daily beer by the case was delivered through the back stairway. At one time the place was raided by the police. The upstairs had many windows on all sides and the storeroom occupied by the defendant likewise had large windows and open-ings. Defendant had several men employees and two or three young ladies.

Defendant complained to plaintiff's agent of the tenants upstairs in the spring of 1915 and the agent promised that if conditions continued he would see that the upstairs tenants were put out. These were tenants from month to month. In April or May, 1915, defendant's manager testified that ''they had apparently had a hilarious time upstairs, and had allowed water to run, and flooded our storeroom, and a large piece of the ceiling fell.'' Thereupon defendant's manager called up plaintiff's agent and described what had taken place and told him that the defendant could not stand the conditions any longer and that they would have to be changed. During this conversation defendant's manager explained to plaintiff's agent the character of the place being conducted upstairs. Plaintiff's agent did nothing to remedy the evil but instead he stated that he thought defendant's manager must be mistaken; that he had never heard any adverse reports; that he thought everything would be all right.

About the middle of July a woman rushed down-stairs into defendant's office clad in a Kimona only, called up the police, and with a long oath stated to

the police that some "fellow" was trying to shoot her.
The oath used involved the mother of the person who
was trying to do the shooting and was uttered in the
presence of two young lady stenographers employed
by defendant. The next day defendant's manager
called up plaintiff's agent and told him about this
last· incident and said, "This is the last; we
cannot stand it any longer and will simply have to move
out." He told plaintiff's agent that he would come
down to see him, which he did the next day. At this
last interview with plaintiff's agent the agent told de-
fendant's manager that he (the agent) had to be very
careful about preferring charges against a tenant, saying
that he had had an experience of that kind once and that
it cost him a lawsuit and that he had trouble in proving
his statement. However, he told defendant's manager
that he had mailed a notice the day before notifying
the Davis woman to vacate on or before September
1, 1915. Defendant immediately vacated the premises,
defendant's manager giving as the reason therefor
that he had no assurance that plaintiff's agent would
be able to get the Davis woman out on account of
plaintiff's agent expressing doubts about the matter,
as detailed above.

Plaintiff's contention is that there was no eviction
of defendant from the premises and that defendant,
having voluntarily moved, is responsible for the rent
for the balance of the term. The general rule as to
what constitutes eviction, under circumstances such as
those presented in this case, is stated in 11 Amer. and
Eng. Ency. of Law, p. 471 (2 Ed.), and approved by
the St. Louis Court of Appeals in Delmar Investment
Co. v. Blumenfield, 118 Mo. App. l. c. 318, as follows:

"An eviction is not necessarily an actual, forcible
taking possession of the demised premises by the land-
lord, nor does it necessarily consist in the expulsion
of the tenant or a physical interference with the de-
mised premises; nor need it· be attended with a
denial or refusal to permit the tenant longer. to occupy
the premises under the lease. Any intentional and

injurious interference by the landlord or those acting under his authority, which deprives the tenant of the means or the power of beneficial enjoyment of the demised premises or any part thereof, or materially impairs such beneficial enjoyment, is a constructive eviction.''

That an eviction is not necessarily an actual, forcible taking possession of the demised premises by the landlord but may be established by showing an intentional or injurious interference by the landlord, or those acting under his authority, which deprives the tenant of the beneficial enjoyment of the demised premises is generally recognized by the authorities. [2 Tiffany on Landlord and Tenant, p. 1282; 1 Taylor on Landlord and Tenant (9 Ed.), section 309a; 2 McAdam on Landlord and Tenant (4 Ed.), sec. 404; Dyett v. Pendleton, (N. Y.), 8 Cowen 727; Jackson v. Eddy, 12 Mo. 209; Delmar Investment Co. v. Blumenfield, supra; French v. Pettingill, 128 Mo. App. 156.]

As stated in French v. Pettingill, supra, l. c. 160, the courts of this State have declined to frame a rule of general application by which to determine what amounts to a constructive eviction of a tenant and it is almost impossible to lay down any general rule with reference to this matter, as it is often difficult to determine just what acts or conduct on the part of the landlord amounts to an eviction. It was held in French v. Pettingill, supra, where the landlord rented a portion of the premises for club purposes and the club maintained a bowling alley and a restaurant where drinks were served, about which persons congregated and became intoxicated and late at night used loud and profane language which disturbed the peace and quiet enjoyment of the defendant who was the plaintiff's tenant in another portion of the premises, that there was no showing that the landlord intended to authorize the use of the premises for disgraceful or immoral purposes and that there was no eviction, there being no proof that the landlord was in any way responsible for the disorder on the premises. There was no com-

plaint made to the landlord and there is nothing in the opinion to show that the landlord even knew, before the tenant in that case moved out, of the conditions present.

It is stated by Tiffany on Landlord and Tenant, supra, p. 1282, that where a portion of the premises is used by another tenant for prostitution or gambling, there is no eviction of the adjoining tenant where the landlord had no reason to suspect, at the time of making the lease, that the disreputable tenant would be guilty of such improper use, he having no greater power than the tenant subsequently to prevent it. However, the rule stated by Tiffany seems to contemplate that the disreputable tenant must be holding under an unexpired written lease which does not permit his removal by the landlord by a simple notice to quit, such as is provided by the laws of this State where the renting is from month to month. Otherwise, why would it have been stated that the landlord had no greater power than the complaining tenant to subsequently prevent the nuisance? However, it is the rule in this State that if it is shown that the landlord consents to or connives at a nuisance of this kind, there is no duty on the part of the tenant to do anything towards abating it.

It was stated by Judge SHERWOOD in the case of Paddock v. Somes, 102 Mo. l. c. 239, that where a person is deprived of the exercise of enjoyment of a legal right by some nuisance, he is not required "to spend a dollar" or to make any exertion whatever to abate the nuisance.

It is apparent that the landlord cannot say that there has been no eviction merely because he did not rent the premises for an unlawful purpose. If he leases the premises, not knowing the character of the tenant and for a lawful purpose and afterwards a nuisance, such as a house of prostitution, is maintained by the landlord's sufferance, connivance or consent, then he has been guilty of a constructive eviction of

a tenant who is forced to move on account of the nuisance. [Wilheim v. Baxter, 46 Colo. 155; 1 Taylor on Landlord and Tenant (9 Ed.), sec. 316; McAdam on Landlord and Tenant (4 Ed.), sec. 404.

There is no evidence in this case that plaintiff's agent at the time he rented the upstairs portion of the premises to the Murphy and Davis women knew of their disreputable character. However, on two different occasions in the spring of 1915, his attention was called to what was going on there and he took no steps whatever to put them out, although they were tenants from month to month. The place that the Davis woman was running was of such a notorious character that plaintiff's agent must have known what was going on even without notice to him of the conditions by defendant's manager. However, there is no question in this case but what plaintiff's agent knew of the existence of the nuisance and connived at it and permitted it to exist. Under the facts in this case we think it must be said that he permitted the nuisance to exist although he had ample opportunity and the power to abate it.

Plaintiff contends that defendant should have remained on the premises and awaited the result of the agent's efforts to get the Davis woman out of the premises. The Davis woman moved out a few days after the giving of the notice by plaintiff's agent but after defendant had notified plaintiff's agent that he would vacate and move elsewhere. Defendant's manager had twice complained of the condition present before the third and last time, after which he moved out. As before stated, nothing was done to abate the nuisance until defendant notified plaintiff's agent that he would vacate the premises. At this time plaintiff's agent instead of giving defendant definite assurance that he would put the disreputable tenants out, beclouded the matter by expressing doubt as to ability to get the Davis woman out of the premises. If defendant had suffered a constructive eviction, we see no reason why it should, before making arrange-

ments to move elsewhere, await the result of an effort on the part of the landlord to get the disreputable tenant out, at least, where it was shown that the landlord was offering some lame excuse why he might · be frustrated in his efforts to remove the objectionable tenant and thus abate the nuisance.

We think it clear that the conduct of plaintiff's agent in permitting this nuisance, which was of a most objectionable and disgraceful character, amounted to a constructive eviction of defendant, that the defendant was within its rights in vacating, and that this action cannot be maintained for the rent for the balance of the term.

The judgment is affirmed.   All concur.